UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| SEANAH J. DIXON<br><br>        Plaintiff<br>v.<br><br>KENNETH WILLIAMS, et al.,<br><br>        Defendants | Case No.: 2:24-cv-02103-APG-BNW<br><br>**Order Denying Plaintiff Seanah Dixon's Motions for Injunctive Relief**<br><br>[ECF Nos. 2, 3] |

Seanah J. Dixon is an inmate in the custody of the Nevada Department of Corrections (NDOC) and is currently housed at High Desert State Prison (HDSP). She sues various NDOC employees under 42 U.S.C. § 1983, claiming violations of her First and Eighth Amendment rights. She alleges that the defendants have shown a deliberate indifference to her medical needs and have retaliated against her by delaying and withholding critical medical care, before and after she experienced a stroke and was discharged from the hospital.

Dixon moved for a temporary restraining order (TRO) and a preliminary injunction, requesting that I compel the defendants to:

(1) immediately facilitate a cardiologist consultation based on her hospital discharge plan,

(2) stop its employees from substituting or changing her medications without specialist approval,

(3) refer her to "all specialty doctors and conducting all outstanding diagnostic procedures," and

(4) stock necessary medications at HDSP.

ECF No. 2 at 3-4 (simplified).  NDOC opposed,[1] arguing that Dixon is not likely to succeed on the merits of her Eighth Amendment claim because she has failed to exhaust her administrative remedies and because she has not shown that NDOC officials were deliberately indifferent to her medical needs.  It also argued that Dixon cannot establish that she will suffer irreparable harm without injunctive relief and that the balance of equities and public interest do not favor me granting it.

I previously denied three of Dixon's four requests for relief.  I denied Dixon's first request for relief as moot and denied her third and fourth requests as not meeting the standards for relief under the Prison Litigation Reform Act. ECF No. 21.  I deferred deciding on her second request to stop NDOC employees from substituting or changing her medications without specialist approval because Dixon subsequently filed addenda alleging that NDOC medical providers had stopped two of her discharge prescription medications in January and February 2025, which NDOC did not address in its status report. ECF Nos. 20 at 3; 24 at 2-3; 28 at 2.  I then ordered the defendants to file a response to my order to show cause and address the alleged stops. ECF No. 31.  The defendants responded with an explanation of Dixon's treatment with respect to her medications. ECF No. 36.  Because Dixon has not shown a likelihood of success on the merits of her Eighth Amendment claim, I deny her motions for injunctive relief.

I. **LEGAL STANDARD**

To qualify for a temporary restraining order or a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships favors the plaintiff, and (4) an injunction is in the public interest.

---

[1] At the time the opposition was filed, the Nevada Attorney General's Office had not yet accepted service for any defendant, so NDOC appeared as an interested party.

2

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, under the sliding scale approach, the plaintiff must demonstrate (1) serious questions on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships tips sharply in the plaintiff's favor, and (4) an injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Because Dixon seeks a mandatory injunction to require the defendants to take affirmative action, she also must show that "the facts and law clearly favor" her. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (quotation omitted). Mandatory injunctions are "particularly disfavored" because they go "well beyond simply maintaining the status quo." *Id.* (quotation omitted).

As to the merits of an Eighth Amendment claim, "[t]he government has an obligation to provide medical care for those whom it is punishing by incarceration and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under § 1983." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quotation omitted). "To establish an Eighth Amendment violation, a plaintiff must satisfy both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014).

To establish the first prong, "the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quotation omitted). A medical need qualifies as serious when the inmate has: (1) "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment," (2) a "medical condition that significantly affects an individual's daily activities," or

3

(3) "chronic and substantial pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). Where the claim of medical indifference stems from an alleged delay in receiving medical treatment, the prisoner must show that the delay itself led to further injury. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (holding that "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference").

"Deliberate indifference is a high legal standard. A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To establish deliberate indifference, a plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d at 1096. "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* (quotation omitted). "A prison official is deliberately indifferent under the subjective element of the test only if the official knows of and disregards an excessive risk to inmate health and safety." *Colwell*, 763 F.3d at 1066 (quotation omitted). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

When deciding whether an official has been deliberately indifferent to an inmate's serious medical needs, I "need not defer to the judgment of prison doctors or administrators." *Colwell*, 763 F.3d at 1066 (quotation omitted). But a "difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is

4

appropriate does not amount to deliberate indifference." *Id.* at 1068 (quotation omitted). Instead, "the plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to plaintiff's health." *Id.* (quotation omitted). However, "[a] prisoner need not prove that [s]he was completely denied medical care," for "[s]he can establish deliberate indifference by showing that officials intentionally interfered with h[er] medical treatment." *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (en banc).

## II.  BACKGROUND

On October 4, 2024, Dixon was admitted to Spring Valley Hospital for a stroke. ECF No. 19-1 at 48. The discharge plan issued by her treating physicians at Spring Valley Hospital included a new prescription for furosemide and an existing prescription for apixaban, both to be taken daily. *Id.* at 2, 4. The brand name for furosemide is Lasix, and the brand name for apixaban is Eliquis. *Id.* at 27, 35. According to information included in Dixon's discharge papers, furosemide is "used to treat fluid retention (edema) in people with congestive heart failure." *Id.* at 28. Dixon's medication list included boilerplate language advising that she should "[t]alk to [her] doctor before stopping any [] medications." *Id.* at 4. In her complaint, Dixon alleges that following discharge from the hospital, NDOC medical employees did not provide her with her discharge medications, including furosemide and apixaban, and that their "protracted delay[] in providing her medications . . . subject[ed] her" to a number of serious, adverse health effects. ECF No. 7 at 33-34.

NDOC previously did not respond to Dixon's allegation about not receiving her apixaban and furosemide prescriptions, mentioning only the discharge plan's order for her "to take aspirin and statins." ECF No. 10 at 3. It argued that Dixon is unlikely to succeed on the merits of her

Eighth Amendment claim because she failed to exhaust her administrative remedies and because the defendants were not deliberately indifferent to her serious medical needs. It contended that Dixon's "disagreement with the care offered by medical professionals" does not support her claim and that "[s]he does not have the right to direct her own medical care." *Id.* at 7. NDOC further contended that Dixon has not shown a likelihood of irreparable harm without injunctive relief, and that neither the balance of equities nor the public interest weigh in her favor.

In Dixon's reply, she initially conceded that she received her furosemide and apixaban prescriptions, though "only . . . after her TRO/PI filing November 13, 2024." ECF No. 17 at 9. She also included copies of emergency grievances she filed at HDSP after being discharged from the hospital, in which she complained she was not being given furosemide and that she was experiencing breathing issues and chest pains as a result. *Id.* at 73-78. Specifically, in an emergency grievance dated on October 16, 2024, Dixon stated that "[o]ne of the prescribed meds that helps my failing heart pump fluids off my lungs ("Lasi[x]") still 8 days later has not been administered to me. I'm havin[g] breathing issues—upper chest pains. I NEED this medication[.]" *Id.* at 73. The supervisor comment on the grievance form states that Dixon was already on spironolactone. *Id.* In her complaint, Dixon states that she was "on spiro[no]lactone for 12 years prior to 10/03/24[,] making evident it was ineffective in removing lung fluid." ECF No. 7 at 31. Her complaint also alleges that by October 21, 2021, she had still not received her furosemide medication and when she complained to an HDSP nurse, the nurse "falsely conclud[ed] after argument that [her] spiro[no]lactone served the same function as her Lasi[x]." *Id.* at 33.

In her second addendum filed on January 29, 2025, Dixon did not allege that the defendants had stopped administering apixaban to her. ECF No. 20 at 3. Thus, I ruled in my

6

previous order that her request for injunctive relief related to apixaban is moot. ECF No. 21 at 6. However, she also alleged in her second addendum that "despite being prescribed furosemide, prior to her January 21, 2025 heart attack[,] said medication had not been administered for in excess of 3 weeks." ECF No. 20 at 3. The addendum also included a copy of an emergency grievance Dixon filed on January 20, 2025, where she complained of chest tightness and breathing issues, in addition to stating that she "ha[d] not had [her] Lasi[x] meds in over 4 weeks." *Id.* at 5.

On February 6, the defendants submitted a status report. ECF No. 24. They reported that nurse Betty Omandac[2] had discontinued Dixon's furosemide medication on October 23, 2024 "for [a] short period for evaluation due to the duplicate therapy with both diuretics" as Dixon was already taking another "diuretic called [s]pironolactone 100mg daily as part of her [h]ormone [r]eplacement therapy." *Id.* at 2-3. But Omandac reordered the medication on November 13, 2024 at a reduced frequency for three days of the week, instead of daily, "until [the nurse] receive[d] a recommendation from the [c]ardiologist on whether or not both diuretics should be given together on a daily basis." *Id.* at 2. The defendants did not address Dixon's allegation that they had stopped her furosemide prescription for over three weeks in January 2025. On February 13, 2025, Dixon filed a response to the defendants' status report, stating that "as of the current date[,] defendants have deprived [her] of her cardiologist ordered Eliquis for in excess of a week[,] purposefully failing to reorder it and again without cardiology input." ECF No. 28 at 2.

I then ordered the defendants to file a response to my order to show cause addressing (1) whether NDOC medical providers stopped Dixon's furosemide/Lasix prescription in January

---

[2] Omandac is not a named defendant.

2025, and if so, for how long; (2) whether NDOC medical providers stopped her apixaban/Eliquis in February 2025, and if so, for how long; and (3) what medical basis they had for each of the stops. ECF No. 31 at 4. I also requested that they explain what the defendants have done or what they plan to do to obtain a recommendation from a cardiologist on (a) whether NDOC medical providers may safely provide Dixon her preexisting spironolactone prescription along with a daily 20mg furosemide dosage pursuant to her discharge plan prescription from Spring Valley Hospital, and (b) if not, what changes NDOC medical providers should make to her furosemide prescription to make it compatible with her existing hormone replacement therapy regimen. *Id.*

In their response, the defendants state that NDOC medical providers did not stop Dixon's furosemide/Lasix prescription in January 2025. Rather, the regimen was reduced to three days a week as they previously noted in their status report "based on the medical provider's opinion that Lasix would exacerbate the properties of other medications Dixon was taking for her gender dysphoria treatment." ECF No. 36 at 2. They also state that NDOC's medical department has recently contacted a cardiologist regarding whether it could safely provide Dixon the daily 20mg furosemide dosage along with her existing spironolactone prescription, and that upon cardiologist approval, "there would be no reason not to resume the Lasix to a daily regimen." *Id*. The defendants also note that Dixon's cardiologist requested a loop recording be completed prior to the next appointment, and the case manager nurse has submitted a request for a loop recorder. *Id.* at 3. Once the recording is completed, NDOC medical providers plan to schedule the follow-up cardiology appointment. *Id.*

Regarding her apixaban/Eliquis prescription, the defendants confirm that NDOC medical providers stopped administration on February 5, 2025 after the Utilization Review Panel (URP)

denied a non-formulary request in order to "assess the patient to determine if anti-coagulation therapy was appropriate and if appropriate to refer the patient to the Coumadin clinic." *Id.* at 2. She has since "been referred to the Coumadin clinic for management of her blood thinning treatment." *Id.* Dixon thereafter filed another addendum and various exhibits, alleging that defendant Kenneth Williams had been making "substantial adverse medical decisions in [her] clinical case" without a medical license, including discontinuing her apixaban medication. ECF Nos. 37 at 3; 38; 39; 41.

### III.  ANALYSIS

Dixon has established her serious medical need. Dixon's discharge documents from Spring Valley Hospital confirm that she experienced an acute cerebral ischemia, for which she was hospitalized, treated, and ordered to adhere to post-discharge medications and treatments, including a daily 20mg dosage of furosemide. ECF Nos. 10 at 3; 19-1 at 2-4, 48. A stroke is a condition that a reasonable doctor or patient would find important and worthy of treatment. *See McGuckin*, 974 F.2d at 1059-60. Following discharge from the hospital, Dixon filed multiple emergency grievances complaining that she had not received her furosemide prescription, as well as reporting serious chest pain and breathing issues in those periods that she was deprived of the medication. ECF Nos. 17 at 73; 20 at 5. In her complaint, she states that these "protracted delays in providing her medications[] expos[ed] and subject[ed] her to wantonly immense terror and sufferings, heart attacks, [and] strokes." ECF No. 7 at 34. In her second addendum, she alleges that she was not provided her prescription for over three weeks before she experienced a heart attack on January 21, 2025. ECF No. 20 at 3. Thus, she is not alleging a mere delay in treatment, but has presented evidence that the delay in receiving her medication has caused her further injury.

However, Dixon has not met her burden of showing it is likely that she will succeed on the merits regarding deliberate indifference given the medical bases for her current course of treatment. The NDOC medical providers have denied stopping the furosemide medication since restarting it in November. They state they have instead administered a reduced regimen due to concerns of "exacerbat[ing] the properties of other medications [(spironolactone)] Dixon was taking for her gender dysphoria treatment." ECF No. 36 at 2. The medication list the hospital provided as part of Dixon's discharge plan does not list spironolactone as one of her "unchanged" medications, unlike apixaban, which is listed. ECF No. 19-1 at 4. This suggests a possibility that her Spring Valley Hospital medical providers might not have been aware of her preexisting spironolactone prescription when prescribing a daily regimen of furosemide. In any case, NDOC medical providers have also submitted a request for a loop recorder, plan to schedule a follow-up appointment with her cardiologist after completing the recording as requested by the cardiologist, and have indicated they are willing to restore her furosemide prescription back to a daily dosage once they receive approval from the cardiologist to do so. While the medical providers have stopped the apixaban prescription, they did so on the decision of the URP, which sought to assess whether continuing anti-coagulation therapy would be appropriate for Dixon. ECF No. 36 at 2. As an alternative course of treatment, Dixon's providers have since referred her to the Coumadin clinic to manage her blood thinning treatment. *Id.*

Dixon does not point to any other evidence that the alternative treatment plans devised by the NDOC medical providers are medically unacceptable under the circumstances and chosen in conscious disregard of an excessive risk to her health. Nor has she shown a likelihood that these decisions regarding her medication are "more than a difference of medical opinion as to the need to pursue one course of treatment over another." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th

Cir. 2012) (quotation omitted). While Dixon alleges that defendant Kenneth Williams has made decisions regarding her care without a medical license, including discontinuing her apixaban prescription, the defendants previously noted in their latest response that the decision against renewal was made by the URP, a "group made up of all of the providers in the NDOC system," not just Williams. *Id.* at 2-3. Dixon does not argue that all the URP members made their recommendations without being licensed.

Because it appears unlikely that Dixon will succeed on her Eighth Amendment claims, I deny her request for injunctive relief to stop NDOC medical providers from substituting or changing her medications without specialist approval.

## IV. CONCLUSION

I THEREFORE ORDER plaintiff Seanah J. Dixon's motions for injunctive relief **(ECF Nos. 2, 3) are DENIED**.

DATED this 13th day of March, 2025.

                                                            _____
                                                            ANDREW P. GORDON
                                                            CHIEF UNITED STATES DISTRICT JUDGE